COPY

1  Robert S. Green (State Bar No. 136183)
   **GREEN WELLING LLP**
2  235 Pine Street, 15th Floor
   San Francisco, California 94104
3  Telephone: (415) 477-6700
   Facsimile: (415) 477-6710
4
   Marc A. Topaz
5  Richard A. Maniskas
   **SCHIFFRIN & BARROWAY, LLP**
6  280 King of Prussia Rd.
   Radnor, PA 19087
7  Telephone: (610) 667-7706
   Facsimile: (610) 667-7056
8
   Attorneys for Plaintiff
9

ORIGINAL FILED
MAR 2 4 2005
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-filing

10           **UNITED STATES DISTRICT COURT**

11          **NORTHERN DISTRICT OF CALIFORNIA**

12



13  BARRY BAKER, Individually and On Behalf of      )
    All Others Similarly Situated,                  )   **CIVIL ACTION NO.**
14                                                  )
                      Plaintiff,                    )
15                                                  )
          vs.                                       )   **CLASS ACTION COMPLAINT**
16                                                  )
    ELECTRONIC ARTS INC., LAWRENCE                  )
17  PROBST, III, and WARREN JENSON,                 )
                                                    )   **JURY TRIAL DEMANDED**
18                    Defendants.                   )
                                                    )
19

20

21        Plaintiff, Barry Baker ("Plaintiff"), individually and on behalf of all other persons similarly

22  situated, by his undersigned attorneys, for his complaint against defendants, alleges the following

23  based upon personal knowledge as to himself and his own acts, and information and belief as to all

24  other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys,

25  which included, among other things, a review of the defendants' public documents, conference calls

26  and announcements made by defendants, United States Securities and Exchange Commission

27  ("SEC") filings, wire and press releases published by and regarding Electronic Arts Inc. ("EA" or

28  the "Company") securities analysts' reports and advisories about the Company, and information

readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist
for the allegations set forth herein after a reasonable opportunity for discovery.

### NATURE OF THE ACTION

1.    This is a federal class action on behalf of purchasers of the publicly traded securities
of EA between January 25, 2005, and March 21, 2005 (the "Class Period"), seeking to pursue
remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

### JURISDICTION AND VENUE

2.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of
the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder
(17 C.F.R. §240.10b-5).

3.    This Court has jurisdiction over the subject matter of this action pursuant to §27 of
the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

4.    Venue is proper in this Judicial District pursuant to §27 of the Exchange Act,
15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein,
including the preparation and dissemination of materially false and misleading information, occurred
in substantial part in this Judicial District.  Additionally, the Company maintains a principal
executive office in this Judicial District.

5.    In connection with the acts, conduct and other wrongs alleged in this complaint,
defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,
including but not limited to, the United States mails, interstate telephone communications and the
facilities of the national securities exchange.

### PARTIES

6.    Plaintiff, Barry Baker, as set forth in the accompanying certification, incorporated
by reference herein, purchased EA securities at artificially inflated prices during the Class Period
and has been damaged thereby.

7.    Defendant EA is a Delaware corporation that maintains its principal place of business
at 209 Redwood Shores Parkway, Redwood City, CA 94065.

8.    Defendant Lawrence F. Probst, III ("Probst") was, at all relevant times, the Company's Chairman of the Board and Chief Executive Officer.

9.    Defendant Warren Jenson ("Jenson") was, at all relevant times, the Company's Executive Vice President, Chief Financial and Administration Officer.

10.    Defendants Probst and Jenson are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of EA's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them but not to the public, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

11.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased the securities of EA between January 25, 2005 and March 21, 2005, inclusive (the "Class Period") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

12.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, EA's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members

1  in the proposed Class.  Record owners and other members of the Class may be identified from

2  records maintained by EA or its transfer agent and may be notified of the pendency of this action

3  by mail, using the form of notice similar to that customarily used in securities class actions.

4       13.    Plaintiff's claims are typical of the claims of the members of the Class as all members

5  of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that

6  is complained of herein.

7       14.    Plaintiff will fairly and adequately protect the interests of the members of the Class

8  and has retained counsel competent and experienced in class and securities litigation.

9       15.    Common questions of law and fact exist as to all members of the Class and

10 predominate over any questions solely affecting individual members of the Class.  Among the

11 questions of law and fact common to the Class are:

12       (a)  whether the federal securities laws were violated by defendants' acts as alleged

13 herein;

14       (b)  whether statements made by defendants to the investing public during the Class

15 Period misrepresented material facts about the business, operations and management of EA; and

16       (c)  to what extent the members of the Class have sustained damages and the proper

17 measure of damages.

18       16.    A class action is superior to all other available methods for the fair and efficient

19 adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

20 damages suffered by individual Class members may be relatively small, the expense and burden of

21 individual litigation make it impossible for members of the Class to individually redress the wrongs

22 done to them.  There will be no difficulty in the management of this action as a class action.

23                     **SUBSTANTIVE ALLEGATIONS**

24                            **Background**

25       17.    EA develops, markets, publishes and distributes interactive software games that are

26 playable by consumers on platforms, including home videogame machines, such as the Sony

27 PlayStation 2, Microsoft Xbox, Nintendo GameCube and Sony PlayStation consoles; personal

28 computers (PCs); handheld game machines, such as the Game Boy Advance, and online, over the

1  Internet and other online networks.  The products designed to play on consoles and handhelds, are

2  published under license from the manufacturers of these platforms, such as Sony for the PlayStation

3  and PlayStation 2, Microsoft for the Xbox and Nintendo for the Nintendo GameCube and Game Boy

4  Advance.  The Company pays a fee to the console manufacturers for the right to publish products

5  on their platforms.  EA invests in the creation of software tools that it uses in product development

6  and to convert products from one platform to another.

<div align="center">

**Materially False And Misleading
Statements Issued During The Class Period**

</div>

7

8      18.     The Class Period starts on January 25, 2005.  At that time, EA in a press release,

9  issued the following guidance for fiscal year ending March 31, 2005:

10
11     "We expect calendar 2005 to be a defining year," said Warren Jenson,
       Chief Financial and Administrative Officer. "While the year ahead
       will certainly be a year of investment for EA, we expect to see
12     growth through new exciting platforms, a rich slate of great
       entertainment and further globalization of our business."

13
                                    ***
14
       Fiscal Year Expectations - Ending March 31, 2005
15
       ●Net revenue is expected to be between $3.275 and $3.325 billion -
16     as compared to $2.957 billion for fiscal 2004.

17     ●Non-GAAP diluted earnings per share are expected to be between
       $1.90 and $1.95 - as compared to $1.84 for fiscal 2004. This range
18     does not factor in eight cents of estimated charges related principally
       to our acquisition of Criterion Software and tender offer for Digital
19     Illusions C.E.

20     ●GAAP diluted earnings per share are expected to be between $1.82
       and $1.87 - as compared to $1.87 for fiscal 2004.
21
       19.     Also on January 25, 2005, EA held a conference call with investors and analysts.
22
   During the call, EA reaffirmed its previously issued guidance:
23
       Guidance [defendant Jenson] 1. Industry Outlook: 1. Interactive
24     Media Industry: 1. ERTS expects to see continued strength in current
       generation hardware sales. 1. The Co. believes there's a lot of life left
25     in the current generation. 2. Sony has not yet hit its stride with the
       new PS2, and ERTS is still at $149 on both the Xbox and PlayStation
26     2. 3. ERTS expects to see continued strong console demand. 2.
       Steady declines in overall current generation software pricing. 1.
27     There has been little in the way of price degradation in the top 20
       titles over the past four years. 2. ERTS believes consumers are
28     willing to pay premium prices for premium titles. 3. Expects to see

topline growth. 1. The NDS and PSP should expand the global segment considerably in 2005. 2. Providing the hardware manufacturers can deliver the product, the NDS and PSP are expected to likely more than offset any revenue declines associated with current generation consoles for the PC. 4. Globalization is ready for Act II. 1. Europe will continue to expand, markets in Asia will continue to grow rapidly, and online technology will begin to open the markets of India, Eastern Europe, and Russia. 2. Globalization will also begin to impact the way ERTS builds games. 5. Consolidation. 1. With change in transition will come some level of consolidation and possibly attrition. 2. Calendar 2005 Focus: 1. ERTS is focused on expanding global leadership position and believes that this is the year in which it will lay the foundation for the next five years of the Co.'s performance and advantage. 2. To do so, ERTS is focused on the following: 1. Making the necessary investments to win on next generation platforms. 1. In this regard, ERTS is well underway. 2. To win in mobility. 1. ERTS expects to have a strong lineup on both the NDS and PSP. 2. The Co. also expects to build its cell phone game production capability. 3. Further strengthening of the Co.'s global hand, in both Europe and in Asia. 4. Building increasingly scalable and cost effective global development solutions for current and next generation platforms, including handhelds and cell phones. 5. ERTS expects to have acquisition opportunities. 1. The Co. does not intend to alter the discipline of its acquisition screen. 2. Believes there will be opportunities and expects to be active participants. 3. Ubi Soft: 1. ERTS wants to keep all its options open. 2. Expects that, if anything were to happen, it would happen with the full cooperation of Ubi Soft. 1. If anything were to happen, ERTS will not overpay. 3. Ubi Soft shares are currently trading at close to 100% premium to the 120-day avg. before the Co.'s announcement. 1. ERTS purchased its interest before this run up in stock price, at just under EUR20 per share. 4. The Co. is prepared to be a long-term minority shareholder. 4. Market Outlook: 1. In North America, expects the following hardware unit sales: 1. Consoles = between 10-12m units. 2. Handhelds = between 11.5-13.5m units. 2. In Europe, expects the following hardware unit sales: 1. Consoles = between 9-11m units. 2. Handhelds = between 7.5-9.5m units. 3. In North America, expects growth in overall software sales to be between flat to up 5%. 1. Console = down 6-10%. 2. Handhelds = up 70-85%. 3. PC = down 5-10%. 4. In Europe, expects growth in overall software sales to be between flat and up 5%. 1. Consoles = down 6-10%. 2. Handhelds = up 90-110%. 3. PC = flat to down 5%. 5. Full-Year Guidance: 1. Expects revenue to be between $3.275-3.325b vs. $2.957b for FY04. 2. Non-GAAP diluted EPS to be between $1.90-1.95 vs. $1.84 for the prior year. 1. This range does not factor in $0.08 of estimated charges related principally to acquisition of Criterion Software and the tender for Digital Illusions. 3. GAAP diluted EPS to be between $1.82-1.87 vs. $1.87 for the prior year. 1. These expected results also include the projected impact of the Co.'s share repurchase program. 6. 4Q05 Guidance: 1. Expects to ship 26 SKUs vs. 11 a year ago. 2. Expects to ship the following titles in 4Q05: 1. MVP Baseball 2005 on four platforms. 2. Champions League Football on four platforms. 3. FIFA STREET on three platforms. 4. Fight Night 2 on three platforms. 5. NASCAR SimRacing on the PC. 6. NBA STREET Vol. III on three

platforms. 7. Rugby 2005 on three platforms. 8. The Sims 2: University Expansion Pack. 9. Need for Speed Underground on the PSP. 10. Tiger Woods PGA Tour on the PSP. 11. FIFA 2005 on the PSP. 12. NFL STREET 2 on the PSP. 3. Expects Medal of Honor IV and Battlefield 2 to be shipped in 1Q06.

20.    Additionally, the Individual Defendants stated:

Q. Looking into 2005, how should we think about the performance of ERTS on a revenue basis relative to what you are talking about with the market, if we look at the platforms? Are there anomalies to your release schedule that would suggest that your growth rates might be different on a per platform basis than the macro numbers you were talking about? (Edward Williams - Harris Nesbitt)

A. (Warren Jenson) We're not going to get into our guidance until the next qtr., but I can probably add a little more clarity than we have in the past, as we've started into our planning process. So, where we are today is, we spent the last month doing a lot of work with our divisions globally, looking at the markets, looking at our expense base, and also looking at our SKU plant. And if I were to say where we are today relative to three months ago, we feel pretty darn good about topline growth next year. Now, at this point, we're working through all the expense side, and that will be tighter given the investments that we feel are so pivotal for our long-term strength. But, on the growth rate side, as I mentioned, we intend to be the leader on next gen consoles. We want to be the leader in mobility. And third, we're going to continue to produce in a strong way for current gen consoles. And then, I guess that makes -- finally, one longer term point, because I think it's so pivotal, is the investments we are making today in calendar 2004, our FY005 and FY06, are about the long term. The investments we've made with the NFL and ESPN is about building long-term strength and securing our long-term future. And we think we have done a lot of that this qtr. through the strategic moves. Just as those were important in lowering our overall long-term discount rate, the moves we're making to build scalability into our studios and to win in these platforms, while expensive today, are all about helping us to continue to build the strength of our long-term future.

A. (Larry Probst) We don't expect to see blockbuster titles like San Andreas or Halo 2 in the market, in calendar 4Q of 2005, and that potentially presents the opportunity for us to move our market share in a positive direction.

21.    On January 28, 2005, defendant Jenson sold 91,700 shares at $62.180 per share for gross proceeds totaling $5,701,906.00.

22.    Additionally, on January 31, 2005, defendant Jenson sold 108,300 shares at $62.903 per share for gross proceeds totaling $6,812,394.90.  As such, during the Class Period, defendant Jenson sold 200,000 shares for gross proceeds totaling $12,514,300.90.



23.     Also on January 31, 2005, defendant Probst sold 100,000 shares at $63.716 per share for gross proceeds totaling $6,371,600.00.

24.     The statements contained in ¶¶ 18-19 were materially false and misleading when made because defendants failed to disclose or indicate the following: (1) that increased competition from its competitors was eroding EA market share; (2) that hardware shortages were material; (3) that EA continued to suffer from operating margin compression; and (4) that as a result of the above, the Company's statements about its financial performance were lacking in any reasonable basis when made.

### The Truth Begins to Emerge

25.     On March 21, 2005, after the market closed, EA issued a press release with the headline "Electronic Arts Updates Fiscal Year 2005 Estimates." Therein, the Company stated:

> Electronic Arts (Nasdaq:ERTS) today announced revised estimates for the Company's fiscal year ending March 31, 2005. The changes are primarily the result of lower than expected sales in both North America and in Europe.
>
> The Company now expects fiscal year 2005 net revenue to be between $3.100 and $3.125 billion, as compared to the Company's previous estimate of between $3.275 and $3.325 billion.
>
> Non-GAAP diluted earnings per share are now expected to be between $1.70 and $1.72 as compared to the Company's previous estimate of $1.90 to $1.95.
>
> GAAP diluted earnings per share are now expected to be between $1.62 and $1.64 -- as compared to the Company's previous estimate of $1.82 to $1.87.
>
> "These results are clearly disappointing," said Larry Probst, Chairman and Chief Executive Officer. "While our new releases are performing reasonably well, they have not been able to offset a significant falloff in catalog sales."

26.     News of this shocked the market. On March 22, 2005, shares of EA fell $11.20 per share, 16.88 percent, to close at $55.15 per share.

### UNDISCLOSED ADVERSE FACTS

27.     The market for EA's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, EA's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members

1    of the Class purchased or otherwise acquired EA securities relying upon the integrity of the market

2    price of EA's securities and market information relating to EA, and have been damaged thereby.

3         28.    During the Class Period, defendants materially misled the investing public, thereby

4    inflating the price of EA's securities, by publicly issuing false and misleading statements and

5    omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not

6    false and misleading. Said statements and omissions were materially false and misleading in that

7    they failed to disclose material adverse information and misrepresented the truth about the

8    Company, its business and operations, as alleged herein.

9         29.    At all relevant times, the material misrepresentations and omissions particularized

10   in this Complaint directly or proximately caused or were a substantial contributing cause of the

11   damages sustained by Plaintiff and other members of the Class. As described herein, during the

12   Class Period, defendants made or caused to be made a series of materially false or misleading

13   statements about EA's business, prospects and operations. These material misstatements and

14   omissions had the cause and effect of creating in the market an unrealistically positive assessment

15   of EA and its business, prospects and operations, thus causing the Company's securities to be

16   overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading

17   statements during the Class Period resulted in Plaintiff and other members of the Class purchasing

18   the Company's securities at artificially inflated prices, thus causing the damages complained of

19   herein.

20                 **ADDITIONAL SCIENTER ALLEGATIONS**

21        30.    As alleged herein, defendants acted with scienter in that defendants knew that the

22   public documents and statements issued or disseminated in the name of the Company were

23   materially false and misleading; knew that such statements or documents would be issued or

24   disseminated to the investing public; and knowingly and substantially participated or acquiesced in

25   the issuance or dissemination of such statements or documents as primary violations of the federal

26   securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of

27   information reflecting the true facts regarding EA, their control over, and/or receipt and/or

28   modification of EA allegedly materially misleading misstatements and/or their associations with the

1   Company which made them privy to confidential proprietary information concerning EA,

2   participated in the fraudulent scheme alleged herein.

3        31.    Defendants knew and/or recklessly disregarded the falsity and misleading nature of

4   the information which they caused to be disseminated to the investing public.  The ongoing

5   fraudulent scheme described in this complaint could not have been perpetrated over a substantial

6   period of time, as has occurred, without the knowledge and complicity of the personnel at the

7   highest level of the Company, including the Individual Defendants.

8        32.    In addition to the 300,000 shares that the Individual Defendants sold during the Class

9   Period, several insiders took advantage of the fact that EA stock was trading at artificially inflated

10  prices and disposed of 331,739 shares for gross proceeds totaling $19,981,371.71 as evidenced by

11  the chart below:

| NAME | DATE | SHARE/PRICE | GROSS PROCEEDS |
|---|---|---|---|
| Joel Linzner | 02/02/2005 | 27,000 @ $65.444<br>*Total Shares Sold:*<br>*27,000* | $1,766,988.00<br>*Gross Proceeds:*<br>*$1,766,988.00* |
| Bruce McMillan | 02/02/2005<br>02/01/2005 | 75,000 @ $65.640<br>50,000 @ $64.929<br>*Total Shares Sold:*<br>*125,000* | $4,923,000.00<br>$3,246,450.00<br>*Gross Proceeds:*<br>*$8,169,450.00* |
| M. Richard Asher | 01/28/2005 | 23,600 @ $62.683<br>*Total Shares Sold:*<br>*23,600* | $1,479,318.80<br>*Gross Proceeds:*<br>*$1,479,318.80* |
| Gerhard Florin | 01/28/2005<br>01/31/2005 | 20,000 @ $62.600<br>40,000 @ $64.201<br>*Total Shares Sold:*<br>*60,000* | $1,252,000<br>$2,568,040<br>*Gross Proceeds:*<br>*$3,820,040.00* |
| Nancy L. Smith | 01/28/2005<br>01/31/2005 | 34,070 @ $61.503<br>34,069 @ $63.300<br>*Total Shares Sold:*<br>*68,139* | $2,095,407.21<br>$2,156,567.70<br>*Gross Proceeds:*<br>*$4,251,974.91* |
| Stephen G. Bene | 01/28/2005 | 8,000 @ $61.700<br>*Total Shares Sold:*<br>*8,000* | $493,600<br>*Gross Proceeds:*<br>*$493,600* |
|  |  | *Total Shares Sold:*<br>*311,739* | *Total Gross Proceeds:*<br>*$19,981,371.71* |

(Emphasis added.)

**Applicability Of Presumption Of Reliance:**
**Fraud-On-The-Market Doctrine**

33.     At all relevant times, the market for EA securities was an efficient market for the following reasons, among others:

(a)  EA stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)  As a regulated issuer, EA filed periodic public reports with the SEC and the NASDAQ;

(c)  EA regularly communicated with public investors <u>via</u> established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)  EA was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

34.     As a result of the foregoing, the market for EA securities promptly digested current information regarding EA from all publicly-available sources and reflected such information in EA stock price. Under these circumstances, all purchasers of EA securities during the Class Period suffered similar injury through their purchase of EA securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

35.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent

1  that the statutory safe harbor does apply to any forward-looking statements .pleaded herein,

2  defendants are liable for those false forward-looking statements because at the time each of those

3  forward-looking statements was made, the particular speaker knew that the particular forward-

4  looking statement was false, and/or the forward-looking statement was authorized and/or approved

5  by an executive officer of EA who knew that those statements were false when made.

6  <div align="center">**FIRST CLAIM**
**Violation Of Section 10(b) Of**
7  **The Exchange Act Against And Rule 10b-5**
**Promulgated Thereunder Against All Defendants**</div>

8

9  36.    Plaintiff repeats and realleges each and every allegation contained above as if fully

10  set forth herein.

11  37.    During the Class Period, defendants carried out a plan, scheme and course of conduct

12  which was intended to and, throughout the Class Period, did: (i) deceive the investing public,

13  including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other

14  members of the Class to purchase EA securities at artificially inflated prices.  In furtherance of this

15  unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set

16  forth herein.

17  38.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue

18  statements of material fact and/or omitted to state material facts necessary to make the statements

19  not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud

20  and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high

21  market prices for EA securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

22  All defendants are sued either as primary participants in the wrongful and illegal conduct charged

23  herein or as controlling persons as alleged below.

24  39.    Defendants, individually and in concert, directly and indirectly, by the use, means

25  or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

26  continuous course of conduct to conceal adverse material information about the business, operations

27  and future prospects of EA as specified herein.

28



40.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of EA value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about EA and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of EA securities during the Class Period.

41.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

42.     The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing EA's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout

1 │ the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and

2 │ omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from

3 │ taking those steps necessary to discover whether those statements were false or misleading.

4 │      43.    As a result of the dissemination of the materially false and misleading information

5 │ and failure to disclose material facts, as set forth above, the market price of EA securities was

6 │ artificially inflated during the Class Period.  In ignorance of the fact that market prices of EA's

7 │ publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and

8 │ misleading statements made by defendants, or upon the integrity of the market in which the

9 │ securities trades, and/or on the absence of material adverse information that was known to or

10 │ recklessly disregarded by defendants but not disclosed in public statements by defendants during

11 │ the Class Period, Plaintiff and the other members of the Class acquired EA securities during the

12 │ Class Period at artificially high prices and were damaged thereby.

13 │      44.    At the time of said misrepresentations and omissions, Plaintiff and other members

14 │ of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other

15 │ members of the Class and the marketplace known the truth regarding the problems that EA was

16 │ experiencing, which were not disclosed by defendants, Plaintiff and other members of the Class

17 │ would not have purchased or otherwise acquired their EA securities, or, if they had acquired such

18 │ securities during the Class Period, they would not have done so at the artificially inflated prices

19 │ which they paid.

20 │      45.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange

21 │ Act, and Rule 10b-5 promulgated thereunder.

22 │      46.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the

23 │ other members of the Class suffered damages in connection with their respective purchases and sales

24 │ of the Company's securities during the Class Period.

25 │ <div align="center">**SECOND CLAIM**<br>**Violation Of Section 20(a) Of**</div>

26 │ <div align="center">**The Exchange Act Against the Individual Defendants**</div>

27 │      47.    Plaintiff repeats and realleges each and every allegation contained above as if fully

28 │ set forth herein.

complaint.wpd    CLASS ACTION COMPLAINT                                          14

48. The Individual Defendants acted as controlling persons of EA within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

49. In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

50. As set forth above, EA and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

(b) Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

1        (c)  Awarding Plaintiff and the Class their reasonable costs and expenses incurred

2   in this action, including counsel fees and expert fees; and

3        (d)  Such other and further relief as the Court may deem just and proper.

4                          **JURY TRIAL DEMANDED**

5        Plaintiff hereby demands a trial by jury.

6   Dated:  March 24, 2005                    Respectfully submitted,

7                                             **GREEN WELLING LLP**

8

9                                             By: _Robert S. Green_
                                                  Robert S. Green
10

11                                            235 Pine Street, 15th Floor
                                              San Francisco, California 94104
                                              Telephone:  (415) 477-6700
12                                            Facsimile:  (415) 477-6710

13                                            Marc A. Topaz
                                              Richard A. Maniskas
14                                            **SCHIFFRIN & BARROWAY, LLP**
                                              280 King of Prussia Rd.
15                                            Radnor, PA 19087
                                              Telephone:  (610) 667-7706
16                                            Facsimile:  (610) 667-7056

17                                            Attorneys for Plaintiff

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATION OF NAMED PLAINTIFF
### PURSUANT TO FEDERAL SECURITIES LAWS

I, (print name) _____BARRY    BAKER_____ ("Plaintiff") declare, as to the claims asserted under the federal

securities laws, that:

1.  Plaintiff has reviewed the Complaint and authorizes its filing.

2.  Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to

participate in any private action.

3.  Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and

trial, if necessary.

4.  Plaintiff's transaction(s) in the Electronic Arts, Inc. (Nasdaq: ERTS) security that is the subject of this action during

the Class Period is/are as follows[1]:

| No. of Shares | Buy/Sell | Date | Price Per Share |
|---------------|----------|------|-----------------|
| 100 | Buy | Feb 7 2005 | 68 |
|  |  |  |  |
|  |  |  |  |

[1]List additional transactions on a separate sheet of paper, if necessary.

5.  Plaintiff has complete authority to bring a suit to recover for investment losses.

6.  During the three years prior to the date of this Certification, Plaintiff has sought to serve or served as a representative party

or a class in the following actions filed under the federal securities laws (if none, so indicate):_____.

7.  Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro

rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class

as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _23d_ day of ___March___, 200_5_.   _____
                                                    Signature